RECEIVED
IN LAKE CHARLES, LA.

OCT – 4 2012

TONY R. MOORE, CLERK
BY_____
                    DEPUTY

UNITED STATES DISTRICT COURT

WESTERN DISTRICT OF LOUISIANA

LAKE CHARLES DIVISION

| | | |
|---|---|---|
| **DARLENE POOLE** | : | **DOCKET NO. 2:11 CV 00513** |
| **VS.** | : | **JUDGE MINALDI** |
| **GORTHON LINES AB, REDERI AB TRANSATLANTIC, and M/V GORTHON** | : | **MAGISTRATE JUDGE KAY** |

### MEMORANDUM RULING

Presently before the court is a Motion for Summary Judgment (Rec. Doc. 41) by the time charterers, Gorthon Lines A B, Rederi A B Transatlantic, Transatlantic Services A B (together the "time charterers"). This motion is opposed (Rec. Doc. 43) by Blow Sea Shipping Ltd. ("Blow Sea") and Lemissoler Shipmanagement, Ltd. ("Lemissoler").[1] The time charterers filed a Reply (Rec. Doc. 48).

Also before the court is a Motion for Partial Summary Judgment on the issue of liability (Rec. Doc. 40) by the plaintiff, Darlene Poole. This motion is opposed (Rec. Doc. 44) by Blow Sea Shipping Ltd. ("Blow Sea") and Lemissoler Shipmanagement, Ltd. ("Lemissoler"). The plaintiff filed a Reply (Rec. Doc. 46).

The court will consider the motion by the time charterers first, and then will address the plaintiff's motion.

---

[1] This Motion for Summary Judgment has not been opposed by the plaintiff, who is the party suing the time charterers. Blow Sea/Lemissoler have not filed indemnity and/or contribution claims against the time charterers. Such a claim, if filed, would arguably be subject to binding arbitration.

## **Summary Judgment Standard**

A court should grant a motion for summary judgment when the pleadings, including the opposing party's affidavits, "show that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). The party moving for summary judgment is initially responsible for demonstrating the reasons justifying the motion for summary judgment by identifying portions of pleadings and discovery that show the lack of a genuine issue of material fact for trial. *Tubacex, Inc. v. M/V Risan*, 45 F.3d 951, 954 (5th Cir. 1995). The court must deny the moving party's motion for summary judgment if the movant fails to meet this burden. *Id.*

If the movant satisfies this burden, however, the nonmoving party must "designate specific facts showing that there is a genuine issue for trial." *Id.* (quoting *Celotex*, 477 U.S. at 323). In evaluating motions for summary judgment, the court must view all facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). There is no genuine issue for trial, and thus a grant of summary judgment is warranted, when the record as a whole "could not lead a rational finder of fact to find for the non-moving party. . . ." *Id.*

In considering a motion for summary judgment, the district court must view the evidence "through the prism of the substantive evidentiary burden." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986). All justifiable inferences to be drawn from the underlying facts must be viewed in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). "If

2

the record, viewed in this light, could not lead a rational trier of fact to find" for the nonmovant, then summary judgment is proper. *Kelley v. PriceMacemon, Inc.,* 992 F.2d 1408, 1413 (5th Cir.1993). On the other hand, if "the factfinder could reasonably find in [the nonmovant's] favor, then summary judgment is improper." *Id.* Even if the standards of Rule 56 are met, a court has discretion to deny a motion for summary judgment if it believes that "the better course would be to proceed to a full trial." *Anderson,* 106 S.Ct. at 2513; *Sobrino-Barrera v. Anderson Shipping Co., Ltd.,* 2011 WL 5245396, 2 (S.D.Tex.,2011).

## Facts

The defendant, Blow Sea Shipping Ltd., was the owner and/or the bareboat charterer/owner *pro hac vice* of the M/V ALIDA GORTHON. The time charterer of the M/V ALIDA GORTHON was Transatlantic Services AB. Gorthon Lines AB merged with other companies to form Rederi AB Transatlantic.

The plaintiff, Darlene Poole, has alleged injuries occurring when the plastic or Plexiglas roof of a forklift aboard the M/V ALIDA GORTHON fell on her head. The plaintiff's claims were filed pursuant to 33 USC 905(b), which provides a remedy for injuries to longshoremen caused by "vessel negligence." The forklift in question was owned by Transatlantic Services AB. All crewmen aboard the M/V ALIDA GORTHON were employed by Blow Sea Shipping Ltd.

On September 12, 2006, Blow Sea Shipping, Ltd., as "Owner" entered into a time charter with defendant, Transatlantic Services, AB, which tme charter had a term from September 12, 2006 to September 12, 2010.[2] Transatlantic Services, AB, through its sister corporation Rederi AB Transatlantic then entered into a contract with ALCOA to carry carbon anodes into and out of the

---

[2] See time charter agreement.

3

Port of Lake Charles.

The M/V Alida Gorthon was one of three ships that were tasked with carrying carbon anodes to and from Lake Charles. The vessel would come into port, and the Lake Charles Carbon personnel would unload, and then re-load the vessel with certain carbon products. During these procedures, the Lake Charles Carbon personnel would use and operate machinery that was owned and maintained by the vessel. One of these pieces of equipment was a Linde forklift which was being operated by the plaintiff on April 17, 2010.

Testimony reveals that Darlene Poole was operating the vessel-maintained Linde forklift on April 17, 2010, when she tapped a pallet of carbon anodes with the forklift, to set it into place (as was the standard loading procedure). As she did so, the Plexiglas ceiling of the Linde forklift became dislodged and fell on her head and neck. As the plaintiff had previously had cervical surgery, this caused an aggravation to her pre-existing condition.

Ronnie Partin was a witness to the incident. Ronnie Partin is a marine surveyor for Gulf Coast Surveyors. Mr. Partin was surveying the load at the time that the incident occurred with Darlene Poole. He was the closest person to her when it occurred, standing approximately 25 to 30 feet from her. He was looking in the plaintiff's direction, though not focused on her, when he heard a startled yell like she had been hit.[3] Immediately upon hearing that, he went over to Ms. Poole and saw her leaning forward with the Plexiglas ceiling of the forklift on her head.[4] He then helped lift the forklift ceiling off of her, put it back into position, and helped Ms. Poole out of the forklift. He specifically looked to see why the ceiling had fallen, and noticed that there were no fasteners to hold

---

[3] Deposition of Ronnie Partin, pg. 15-16 .

[4] Deposition of Ronnie Partin, pg. 17-21.

4

it into place.[5] He even looked at the Plexiglas to determine if there were holes drilled into it for the insertion of the rear view mirror anchor bolts, but the Plexiglas ceiling had no holes in it whatsoever.[6] Mr. Partin also testified that Ms. Poole was "doing normal operations" at the time that the incident occurred.[7]

Mr. John Ogea was the supervisor of Darlene Poole on April 17, 2010. He was the first supervisor notified of Ms. Poole's incident. He was immediately called to the ship after the incident occurred. Upon arrival, Ms. Poole and Ronnie Partin were still standing near the forklift. Mr. Ogea, as the supervisor on duty, is required to do the initial investigation into any incident.

After taking care of Ms. Poole's medical needs, Mr. Ogea talked to Ronnie Partin, the Surveyor, about what had occurred. Mr. Partin stated that the Plexiglas ceiling had fallen, that Ms. Poole was pinned underneath it, and that he helped get it off of her to get her out of the forklift.[8] Mr. Ogea immediately inspected the forklift and took photographs. He noticed that there were bolt holes in the frame of the forklift to hold down the Plexiglas and took a picture of that.[9] Although there were bolt holes for fasteners, there were no bolts inserted.[10] Later that day, after the machine was repaired by the ship's crew, Mr. Ogea took other photographs which are attached as an exhibit

---

[5] Deposition of Ronnie Partin, pg. 21.

[6] Deposition of Ronnie Partin, pg. 22-23.

[7] Deposition of Ronnie Partin, pg. 45.

[8] Deposition of John Ogea, pg. 32.

[9] Deposition of John Ogea, pg. 34, 40 and Exhibit 1 to Deposition.

[10] Deposition of John Ogea, pg. 34.

5

to his deposition.[11]

As the result of Mr. Ogea's investigation, he filled out an Injury/Illness/Injury-Free Event Report on a form provided to him by the employer. Mr. Ogea filled out this report and repeatedly stated in the report that the event was due to "defective tool/equipment", "other unsafe condition", "defective from normal use", and "inadequate preventive maintenance".[12]

Jessie Guillory is the Health and Safety Manager for Lake Charles Carbon, and has been such since the year 2008.[13] His job is to, among other things; investigate all incidents which occur with any Lake Charles Carbon personnel. On April 17, 2010, Mr. Guillory discovered that an incident had occurred with Ms. Poole. Thereafter he performed a thorough investigation, which included taking statements from co-workers, the surveyor, and talking to the ship's crew. He issued a preliminary report which stated as follows:

> "A dock employee was stacking anodes in the mid upper hold of the Alida Gorthon-an anode ship transferring bake anodes from the Lake Charles Dock. As the worker placed an anode pallet into position, she used the forks of the equipment to tap the load and secure it in place. As the forks tapped the load, an 11 pound piece of Plexiglas which was attached to the ceiling of the fork truck fell approximately 15 inches and struck the worker on the back of her head. While the impact was not great, it was enough to aggravate a pre-existing personal condition the employee had from a 2005 neck surgery. This case was originally a 1st Aid which occurred April 17th, but the employee's condition worsened and had to receive prescription medicine and be placed on restrictive duty."[14]

Mr. Guillory found out that the proper repairs were then made to the fork lift ceiling, in front of the

---

[11]  Deposition of John Ogea, pg. 37-39, Exhibit 2 to Deposition.

[12]  Deposition of John Ogea, pg. 48-51, Exhibit 6 to Deposition.

[13]  Deposition of Jessie Guillory, pg. 8.

[14]  Deposition of Jessie Guillory, pg. 37-42, and Exhibit 3 to Deposition.

6

supervisor which were completed after the incident on April 17, 2010.[15]

In addition Mr. Guillory, through his investigation, was able to determine that the ceiling of this forklift had actually fallen the day before and was simply re-inserted into position by the ship's crew.[16] Obviously, although the ship's crew had knowledge that an incident had occurred on April 16, 2010, they had not properly repaired the ceiling [by bolting it to the head rack plate] leaving the next operator in danger of being hit by the incorrectly repaired-or unrepaired- Plexiglas ceiling.

Mr. Guillory concluded his investigation by issuing a report which stated as follows:

"The investigation was completed with probable causes identified as the following:

1. The Plexi-glass was not secured to the head rack plate as required.

2. When the fork truck tapped the anode, the Plexiglas shifted forward and was released from the rear rim of the head rack it rested on and fell approximately 15 inches on employee driving the fork truck."[17]

The plaintiff, Darlene Poole, was deposed early on in this litigation. She testified that there was a corrective action meeting held very soon after the incident occurred. The purpose of this meeting is to determine what went wrong, why, and how to fix it. During this meeting, her fellow employees, Robert Sonnier and Winston Edwards, said that they had seen the ceiling of the forklift fall the night before her incident, and actually strike a member of the ship's crew.[18]

Winston Edwards' deposition was also taken. His deposition is the most recent one taken and is almost two years removed from the accident date. Mr. Edwards originally testified in his

---

[15] Deposition of Jessie Guillory, pg. 127.

[16] Deposition of Jessie Guillory, pg. 58-62, and Exhibit 5 to Deposition (top of 2nd Page).

[17] Deposition of Jessie Guillory, Exhibit 6 to Deposition.

[18] Deposition of Darlene Poole, pg 111-112.

7

deposition that he could not remember any event occurring with the forklift prior to Ms. Poole's incident. However, after the deposition concluded, he did make such recollection. On the errata sheet, he repeatedly wrote that, in fact, the ceiling of the forklift had fallen the night before on a member of the ship's crew.[19]

A Supercargo is a person who is employed by the Charterer (Transatlantic Services AB) to oversee the loading, stowage, and carriage of the cargo on a particular vessel. This is the only employee of the Charterer aboard the vessel. On the day in question, the Supercargo was Ingvar Svensson. In his affidavit, Mr. Svensson attests that, in accordance with the Time charter, the forklifts are maintained by the ship's crew.[20]

Mr. Svensson was onboard the M/V Alida Gorthon on April 17, 2010. He personally inspected the forklift after the incident was reported. He did so along with several members of the vessel's crew. The particular forklift had been the subject of repairs the previous day by the vessel's crew, whereby the Plexiglas ceiling had to be removed in order to work on a motor.[21] In addition, upon inspecting the forklift after the incident, the mirror on the forklift was missing, so the crew simply inserted screws through the ceiling to secure the Plexiglas after the incident occurred.[22]

## Analysis

### Admissibility Questions

The court must first address issues raised in the opposition to summary judgment that are

---

[19] "Witness Certificate Page" of Winston Edwards.

[20] Svensson affidavit,¶¶ 6 & 11.

[21] *Id.,* ¶8.

[22] *Id.,* ¶10.

evidentiary and concern the admissibility of certain evidence.

The only representative of the time charterer assigned to the vessel at the time of the accident was the supercargo. The supercargo was Ingvar Svensson. The time charter required the ship's crew to service and maintain the forklifts kept aboard the ALIDA GORTHON,[23] which are technically described as H70 Linde lifting machines. Supercargo Svensson learned of the accident involving Darlene Poole and determined that the forklift in question was the one which had been repaired the previous day by the vessel's crew. The time charterer alleges that an electrical motor needed rewinding and to remove the motor it was necessary to remove the Plexiglas roof to the forklift. Allegedly, when the roof was put back into place, it was not secured with screws. Thus, when the forklift driver "banged" on some anodes being stowed aboard the vessel, the Plexiglas roof fell down onto the head of Poole. The time charterer argues that the repair of the electric motor, as well as the duty to properly secure the Plexiglas roof after making the repairs, fell solely on the ship's crew, and not Mr. Svensson or any representative of the time charterers.[24]

Blow Sea argues that Mr. Svensson was not present at the time of the accident and any knowledge about the accident had been obtained through interviews with others, therefore it is not within his personal knowledge and should be excluded. The time charterers submit that portions of Mr. Svensson's declaration were based on personal knowledge and, in an attempt to cure any deficiencies, they attached a supplemental declaration by Mr. Svensson to their Reply.

In addition to the Declaration of Ingvar Svensson, there is other evidence in this case which

---

[23] See the initial Declaration of Ingvar Svensson attached to the time charterer's Motion as Exhibit"B."

[24] *Id.*

9

indicates that the crew of the M/V ALIDA GORTHON may have been aware that the roof of the forklift was not properly secured. Thus, the time charterer argues that, regardless of the reason for the roof being unsecured, it should have been secured by the vessel owner's crew pursuant to Clause 28 of the Charter Party.

Rule 56(c)(4) provides that when affidavits are used to support or oppose a summary-judgment motion, they "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein."[25] A requisite is that the information the affidavit contains (as opposed to the affidavits themselves) would be admissible at trial. *Id.*

Rule 56(c)(4) does not require that the affiant state affirmatively that the averments are based on personal knowledge. Rather, the Rule provides: "Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." A reading of Svensson's affidavit shows that it was "made on personal knowledge," "set(s) forth . . . facts as would be admissible in evidence," and "show(s) affirmatively that (he) is competent to testify to matters stated therein." Therefore, his affidavit may be considered in this summary judgment motion.

The next question of admissibility concerns statements made by the plaintiff. Ms. Poole, at her deposition taken early in this case, testified there was a "corrective action meeting" at Alcoa after

---

[25] When Rule 56 was rewritten in 2010, the substantive requirements for affidavits set out in Rule 56(e)(1) were moved to Rule 56(c)(4). Subdivision (c) now sets out more detailed procedures on how summary judgment may be supported or disputed. The requirements themselves were not changed, although some of the other provisions were relocated elsewhere. Federal Practice and Procedure § 2738.

the accident. During this meeting, Alcoa employees Winston Edwards and Robert Sonnier said they

saw the roof of the forklift fall before her accident:

> …Winston [Edwards] and Robert [Sonnier] had seen it happen to someone
> previously on the night shift. To one of the ship people. They were working on it, and
> it happened to the little guy that was working on the forklift.[26]

Blow Sea submits that Ms. Poole's recollection of what was said at the post-accident meeting

is impermissible hearsay testimony. This statement is being offered to prove knowledge or notice,

not to prove the truth of the statement and it is therefore admissible.

The next issue raised concerns the testimony of Mr. Edwards, who  was deposed over two

years after the accident.  He originally  testified in his deposition that he did not have any

recollection of the roof falling before the accident. However, immediately after his deposition he

advised counsel for Alcoa that he did, in fact, recall such an incident. He subsequently prepared the

attached deposition changes and/or "Witness Certificate Pages." Mr. Edwards repeatedly wrote that

he saw the Plexiglas roof fall on a ship worker the day before Ms. Poole's accident.[27]  Blow Sea

argues that such a statement on an Errata sheet attached to the deposition is an alteration of testimony

taken under oath and should be stricken.

Changes by a deponent to his deposition are controlled by Fed.R.Civ.P. 30(e). That rule

provides:

> If requested by the deponent ... before completion of the deposition, the deponent
> *shall have 30 days* after being notified by the [court reporter] that the transcript ... is
> available in which to review the transcript ... and, if there are changes in form or

---

[26]  Deposition of Darlene Poole, page 111, lines 12-15, pertinent pages attached as
Exhibit "C."

[27]  See signed "Witness Certificate Pages," attached as Exhibit "D."

*substance,* to sign a statement reciting such changes and the reasons given by the deponent for making them.

(Emphasis added.) *Reed v. Hernandez ,* 114 Fed.App'x. 609, 611,( 5th Cir. ,2004).

The Fifth Circuit has not addressed the scope of permissible substantive corrections to a deposition under Rule 30(e). Other circuit courts and federal district courts, including courts within the Fifth Circuit, have varied in their approaches to allowing deposition corrections pursuant to Rule 30(e). *Reilly v. TXU Corp.,* 230 F.R.D. 486, 487 (N.D.Tex., 2005).

The Magistrate Judge writing the opinion in *Reilly v. TXU Corp.,* discussed both a narrow and a broad reading of Rule 30(e) and opted to follow the broader reading . This decision was based upon a review of many cases, including *Lugtig v. Thomas,* 89 F.R.D. 639 (N.D.Ill.1981). In *Lugtig,* the deponent, after consulting with counsel, made  69 substantive changes in his deposition transcript. *Id.* at 641. Those alterations included substituting a "yes" answer for "no" and vice-versa. *Id.* The *Lugtig* court observed that Rule 30(e) specifically authorizes changes to the form or substance of a deposition without placing any limits on such changes or requiring that a judge "examine the sufficiency, reasonableness, or legitimacy of the reasons for the changes." *Id.* (citing *Allen & Co. v. Occidental Petroleum Corp.,* 49 F.R.D. 337, 340 (S.D.N.Y.1970)). Based on this reading of Rule 30(e) and other authority, the *Lugtig* court found that a deponent could make changes that contradict the original answers given, even if those changes are not supported by convincing explanations, as long as the deponent complies with the instructions provided within the rule itself for making such changes. *Lugtig,* 89 F.R.D. at 641 (citing *Allen & Co.,* 49 F.R.D. 337; *Colin v. Thompson,* 16 F.R.D. 194 (W.D.Mo.1954); 4A Moore's Federal Practice, ¶ 30.62; Wright & Miller, Federal Practice and Procedure, § 2118). Allowing changes to a deposition prior to trial, the court

explained, "eliminates the likelihood of deviations from the original deposition in his testimony at trial; reducing surprises at the trial through the use of Rule 30(e) is an efficient procedure." *Lugtig,* 89 F.R.D. at 641.

The broad view espoused by the *Lugtig* court has been characterized as the traditional or majority view. *See Summerhouse v. HCA Health Services of Kansas,* 216 F.R.D. 502, 504-05 (D.Kan.2003) (noting that "the language describing the breadth of permitted changes has remained essentially unaltered since adoption of the Federal Rules of Civil Procedure in 1937"). As in *Lugtig,* courts following the traditional broad view have specifically rejected a narrow interpretation of the Rule as being inconsistent with the plain language of the Rule itself. *See Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 103 (2d Cir.1997) (holding that Circuit held that the language of Rule 30(e) does not place limitations on the types of changes that a witness may submit, even where such changes materially alter deposition testimony); *Foutz v. Town of Vinton,* 211 F.R.D. 293, 295 (W.D.Va.2002) (rejecting *Greenway's* reasoning and stating that Rule 30(e) should be interpreted "broadly as to allow proposed deposition changes to be admitted into evidence"); *DeLoach v. Philip Morris Cos., Inc.,* 206 F.R.D. 568, 573 (M.D.N.C.2002) (rejecting defendants' reading of Rule 30(e), which would strike all but typographical errors, as too narrow); *Holland v. Cedar Creek Mining, Inc.,* 198 F.R.D. 651, 653 (S.D.W.Va.2001) (noting that some authority questions the scope of allowable changes, but finding that the rule itself does not limit substantive changes); *Elwell v. Conair, Inc.,* 145 F.Supp.2d 79, 87 (D.Me.2001) (rejecting the narrow interpretation of Rule 30(e) in *Greenway* and allowing changes in the context of a pretrial motion to strike); *Tingley Sys., Inc. v. CSC Consulting, Inc.,* 152 F.Supp.2d 95, 120 (D.Mass.2001) (stating that "the express language of Rule 30(e) allows a deponent to change the substance of his answers"); *Titanium Metals Corp. v. Elkem*

*Mgmt., Inc.,* 191 F.R.D. 468, 472 (W.D.Pa.1998) (declining to strike deposition changes as an improper material alteration, but ordering that original answers remain a part of the record along with the changes); *Innovative Mktg. & Tech., L.L.C. v. Norm Thompson Outfitters, Inc.,* 171 F.R.D. 203, 205 (W.D.Tex.1997) (holding that the defendants' reading of Rule 30(e), which would strike all but typographical errors, was too narrow); *Sanford v. CBS, Inc.,* 594 F.Supp. 713, 714 (N.D.Ill.1984) (following *Lugtig* and reading Rule 30(e) as allowing any changes).

Courts espousing the broader reading of Rule 30(e) ordinarily implement one or both of the safeguards discussed in *Lugtig,* provided that all other procedural requirements of Rule 30(e) have been met. *See Foutz,* 211 F.R.D. at 295 (stating that the original and corrected answers may be admitted into evidence and reopening the deposition to allow the deponent to be impeached with his contradictory answers); *Elwell,* 145 F.Supp.2d at 87 (declining to strike deposition changes and stating that the presence of the original answers at trial would allow jurors "to discern the artful nature of the changes...."); *Tingley,* 152 F.Supp.2d at 121 (finding that the 22 corrections cited by the movant altered the answers in a manner that warranted reopening of the deposition); *Podell,* 112 F.3d at 103 (holding that the record must include both the original and altered responses); *Sanford,* 594 F.Supp. at 715 (following *Lugtig* and ordering that the original and changed answer, as well as the reason for the change, remain in the record, and reopening the deposition).

This court will apply a broad interpretation of Rule 30(e). This interpretation, unlike the narrow interpretation, is consistent with the plain language of the Rule which expressly contemplates "changes in form or substance" accompanied by a signed statement reciting the reasons for the changes. *See* Fed.R.Civ.P. 30(e). As written, the Rule makes provision for changes in substance that are made for legitimate reasons, such as to correct a misstatement or honest mistake. In the instant

14

case, Mr. Edwards is not a plaintiff and has no direct interest in this litigation.  He made several substantive changes after his deposition, which took place 2 ½ years after the event.  Immediately after the deposition, he told the attorney for the compensation intervener (he did not have his own counsel) that he did, in fact, remember the Plexiglas roof falling the night before Ms. Poole's accident.  He made timely corrections.  Therefore, the Errata sheet will not be stricken.

## Merits of the Motion by the time charterers

When the accident occurred, the plaintiff's injury did not appear severe, but Ms. Poole continued to complain of neck symptoms and ultimately received a repeat cervical fusion. She had previously received a cervical fusion in 2005.[28]

Alcoa supervisor John Ogea investigated the incident immediately after it occurred. He was told that the ceiling of the forklift fell and hit Ms. Poole in the back of the head. He subsequently inspected the forklift in question. He noted holes in the framing supporting the Plexiglas, and in the front of the Plexiglas, but no bolts, screws or other fasteners securing the Plexiglas roof to the framing.[29]  He returned to the vessel  several hours later to make sure that the forklift was properly repaired and he took a photograph showing the fasteners in place.[30]

At the time of the accident, the vessel was time-chartered by her owner (or bareboat

---

[28] The pre-accident, January, 2005 surgery involved a fusion, with hardware, at the C5-6 and C6-7 levels. The March, 2011 surgery following the accident aboard the M/V ALIDA GORTHON involved a  removal of the previous hardware, re-fusion of the C5-7 levels and fusion of the C7-T1 levels using hardware and recombinant bone protein.

[29] Deposition of John Ogea, pages 31 – 41, attached as Exhibit "E."

[30] See photographs, before and after repair, attached to Mr. Ogea's deposition as Exhibits 1-4. Mr. Ogea saw the other forklifts had a mirror where the bolt holes were located, but he never saw a mirror for the forklift in question.

15

charterer), Blow Sea Shipping Ltd., to the defendant Transatlantic Services AB. Transatlantic Services AB and/or one of its related companies subsequently entered into a contract of affreightment to carry cargo for Alcoa, the plaintiff's employer. This was the cargo (anodes) being loaded at the time of the accident.

The M/V ALIDA GORTHON was fully crewed and operated by employees of Blow Sea Shipping Ltd. The only representative of Transatlantic Services AB or any related company was a "supercargo," appointed pursuant to paragraph 14 of the Time charter.

The forklift which plaintiff Poole was operating at the time of the accident was owned by Transatlantic Services AB. The responsibility for maintaining it in good working order rested solely on Blow Sea Shipping Ltd. Blow Sea argues that when Transatlantic agreed to perform all cargo handling, it agreed to bear all the risk, i.e. liability, for cargo handling, including the risk of injuries while loading or stowing cargo aboard the M/V ALIDA GORTHON.

Clause 28 of the Time charter between Blow Sea Shipping Ltd. and Transatlantic Services AB, covering Cargo Gear and Lights, provided:

> The Owners [Blow Sea] shall maintain the cargo handling gear of the Vessel which is as follows: two side doors each with two elevators, cargo tables, *6 pcs. H70 Linde lifting machines*, electrically powered via cable together with attachments such as vacuum and paper clamps. Equipment shall remain the Seller's property and shall be maintained by Owners as long as T/C-party is valid between Owners and Transatlantic Services AB. Equipment to be kept in good working condition, since this item will be part of the T/C agreement. The cost of such service would be USD $60 (Sixty) per day. Cost to be paid by the Charterers [Transatlantic Services AB] to the Owners together with the T/C rate. In case of disable (sic) truck Owners are allowed 3 hours to rectify the disable truck, thereafter the vessel to be offhire in relation to the number of trucks required for the cargo operation. Owners have the right to redeliver any of the trucks that is (sic) not performing and replace it with new as per Charterer's specs and Charterers to pay USD 10 (Ten) per day per new truck. Owners to have first refusal to purchase lifting machines together with belonging

16

equipment at termination of T/C.[31] (Emphasis added).

It is undisputed that the time charterers, not Blow Sea, actually owned the forklift which the plaintiff was operating at the time of the accident.  The time charterers argue that the "only conceivable theory for responsibility"[32] would be their "mere ownership" of the forklift.

Blow Sea agreed to maintain the forklifts while on the vessel pursuant to the charter party agreement, but Blow Sea argues that the Time charterers in turn agreed to bear not only the expense, but also the ultimate responsibility and liability for cargo handling operation, including, they argue, the risk of injuries while loading and stowing cargo:

> [T]he Charterers shall perform all cargo handling, including but not limited to loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk and expense, under the supervision of the Master.  Crew to assist with lashing/unlashing of cargo and placement/inflation/deflation/removal of air dunnage bags and transfer of stevedores' forklift, if required, always provided that....the responsibility and liability to perform the above rest with Charterers.[33]

The time charters submit that this argument by Blow Sea is an attempt to turn a longshoreman claim into a charter party dispute, which it is not.  The time charterers also argue that Clause 28 "squarely and unmistakably"[34] places responsibility for the maintenance of the forklift on Blow Sea and Lemissoler, and that clause takes precedence over any other general clause in the charterparty, "particularly one which is directed toward responsibility for cargo operations."[35]

---

[31] The Time charter is attached to the plaintiff's Motion as Exhibit "A."

[32] Reply Brief, p. 3.

[33] New York Produce Exchange Time charter dated September 12, 2006, cl. 8.

[34] Reply brief, p. 5.

[35] *Id.*

17

In support of their argument relying on Clause 8, Blow Sea cites two cases, *Wiltz v. Maersk, Inc.,* 135 F. Supp.2d 783 (S.D. Tex. 2001) and *Robinson v. Orient Marine Co., Ltd.,* 505 F.3d 364 (5th Cir. 1977).   Judge Sam Kent in *Wiltz* confronted the question of time charterer liability under the revised New York Produce Exchange form, and reiterated the general rule that time charter liability will arise when either 1) the plaintiff's alleged harm was caused by an act within the time charterer's scope of actual or traditional control or 2) if liability was clearly transferred to the charterer by the charter party agreement. *Id.* at 735. The court denied Maersk's motion for summary judgment because (among other things) factual issues existed as to the effect and meaning of changes to Clause 8 in the Standard New York Produce Exchange ("NYPE") form charter party agreement which seems to transfer the risk of injury to the charterer.[36] It has been uniformly held under the old form that the risk of injury is not transferred to the time-charterer.[37]  The court held that the revised Clause 8 "works a sea of change in the law of charter party agreements."[38]

In *Robinson v. Orient Marine Co. Ltd.,* 505 F.3d 364 ( 5th Cir. 2007), cited by Blow Sea and Lemissoler, a longshoreman who was injured unloading cargo sued time charterer and vessel owner seeking compensation under the Longshore and Harbor Workers' Compensation Act (LHWCA). The United States District Court for the Eastern District of Louisiana, Mary Ann Vial Lemmon, J.,

---

[36]  The revised Clause 8 in the Standard New York Produce Exchange form charter party agreement read in pertinent part: "Charterers shall perform all cargo and container handling... at their risk and expense, under the supervision of the Master, who will remain responsible for the vessel's seaworthiness in relation to proper stowage of the vessel." Id. at 785-86 (emphasis added). 15 U.S.F. Mar. L.J. 357, 453 (2002-2003).

[37]   Wiltz, 135 F. Supp. 2d at 785-86 (citing American Home Assurance Co. v. M/V SLETTER, 43 F.3d 995, 997, 1995 AMC 1160 (5th Cir. 1995))

[38]  *Wiltz* at 786.

denied charterer's motion for summary judgment, and charterer filed interlocutory appeal. The Court

of Appeals, Edith Brown Clement, Circuit Judge, held that clause of time charter agreement which

provided that charterer was to perform all cargo handling at its own risk and expense did not create

a new duty for charterer to protect stevedore from harm from improperly stowed cargo, beyond a

mere duty to warn the stevedore of hidden dangers.

Other cases also discuss the limitations of Clause 8. The court in *Clements v. Quark, Ltd.,*

2006 WL 2850177 *3 (E.D. La. 2006), relied on *D/S Ove Skou v. Hebert,* 365 F.2d 341, 351 (5th

Cir.1966), where the Fifth Circuit determined that Clause 8 of the NYPE merely shifts "financial

responsibility" to the charterer for damage to cargo interests, and not liability for personal injuries.

In *D/S Ove Skou,* a longshoreman was injured and sued the time charterer and ship-owner for

unseaworthiness and negligence. The shipowner sought indemnity from the time charterer, but the

Fifth Circuit held that the time charterer was not liable to either party. It further held that the

"charterer had the responsibilities, of a time charterer under a traditional time charter." *Id.* Further,

the Fifth Circuit determined that the "typical clause ... specifying that the captain shall be under the

orders of the charterers 'as regards employment and agency' and that 'charterers are to load, stow

and trim the cargo' does not give to the time charterer any operational control over these activities.

Rather, the charter party provisions are essentially a specification of the party-owner or charterer-

upon whom the ultimate financial cost rests for any one or more of the activities." *Id.* The Fifth

Circuit wrote:

> Although the charterer is to secure and pay for such port activities as pilotage,
> towage, port charges, including arrangements for loading and discharging of cargo,
> such activities if conducted by the ship or its crew do not become those for which the
> time charterer has an operational responsibility ... In the absence of circumstances
> which would give rise to a liability for actions taken by an independent contractor-

none of which are present here-Time charterer has no responsibility to Ship-owner or to third persons including longshoremen for acts or omission or commission by the stevedores. *Id.*

In *Mallard v. Aluminum Co. of Canada, Inc.,* 634 F.2d 236, 242 (5th Cir.1981), following the rule articulated in *D/S Ove Skou,* the Fifth Circuit held that a time charterer, one who has no control over the vessel, assumes no liability for negligence of the crew or unseaworthiness of the vessel absent a showing that the parties to the charter intended otherwise. In *Mallard,* the charter states that "although it is a nondemise charter, under which the owners 'remain responsible for the navigation of the vessel, insurance, crew and all other matters, same as when trading for their own account, [the] charterers are to load, stow and trim and discharge the cargo at their expense under the supervision of the captain...." *Id.* The Fifth Circuit noted that, "in light of *Skou,* this circuit seems reluctant to find any shift of operational responsibility for personal injuries to the time charterer absent clear language to that effect. Thus, the second clause enumerated may impose on the charterer the financial responsibility of providing dunnage of the necessary quality without placing on him the obligation to pay damages for personal injury that the dunnage may cause." *Id.*

The court in *Clements* was guided by the Fifth Circuit's rationale in *D/S Ove Skou* and *Mallard* and found that the cross-claimants had failed to show how the clauses relied on by them in support of their claim encompassed anything beyond cargo liability.

In *Sobrino-Barrera v. Anderson Shipping Co., Ltd.,* 2011 WL 5245396, 8 (S.D.Tex., 2011), the plaintiff, Junior A. Sobrino–Barrera, brought a longshoreman's personal injury claim under section 905(b) of the Longshore Harbor Worker's Compensation Act ("LHWCA"), 33 U.S.C. § 905(b). As a part of his suit, Sobrino-Barrera alleged that the defendant, Oldendorff, breached its contractual duties to the plaintiff "properly [to] stow and place dunnage in the M/V GRETA." The

20

plaintiff pointed to the charter party agreement between Cosco Bulk Carrier Co., Ltd., the owners of the M/V GRETA, and Armada (Singapore) Pte., Ltd., whom Oldendorff asserted and Plaintiff did not dispute was a subcharterer of Oldendorff.

The Supreme Court in *Scindia Steam Nav. Co. v. De los Santos,* 512 U.S. 516 (1994), *Scindia* noted that it "may also be that the contract between the stevedore and the shipowner will have provisions specifically bearing on the dispute." 101 S.Ct. at 1626 n. 23. However, the contract upon which Sobrino–Barrera relied was a time charter between the owners of the M/V Greta and Oldendorff's subcharterer, *not* between Oldendorff and the stevedore. Three circuit courts, including the Fifth Circuit, have held that a clause in a charter party agreement nearly identical to the one relied on by Sobrino–Barrera "acts as an indemnification clause between the owner and the time charterer and does not affect the duties owed to longshoremen." *Robinson v. Orient Marine Co., Ltd.,* 505 F.3d 364, 366 (5th Cir.2007) (clause in time charter agreement did not create a new duty for charterer to protect stevedore from harm from improperly stowed cargo); *see also Carpenter v. Universal Star Shipping, S.A.,* 924 F.2d 1539, 1545 (9th Cir.1991) (same); *Fernandez v. Chios Shipping Co.,* 542 F.2d 145, 152–53 (2d Cir.1976). Accordingly, the court rejected the plaintiff's claim that Oldendorff owed it a contractual duty properly to stow cargo in the M/V GRETA.

In the instant suit, Blow Sea and Lemissoler have not filed a claim for defense and indemnity against the time charterers. The only claim against the time charterers is by Poole, who did not oppose this motion for summary judgment.

The time charterers argue that Clause 8 deals solely with obligations regarding the cargo. It refers to "...loading, stowing, trimming, lashing, securing, dunnaging, unlashing, discharging, and tallying, at their risk and expense." If the cargo is not properly secured or is damaged, the time

21

charterers bear the risk or expense. This clause does not refer to injuries by longshoremen. The cargo did not injure Ms. Poole. Therefore, Clause 28 applies, not clause 8. This is a question of law and this court agrees that Clause 28 controls. The time charterers are not liable for personal injuries to the longshoreman.

### Poole's Motion

This court, having found that the time charterers owed no duty to the longshoreman, Darlene Poole and that §28 of the time charter agreement prevails, finds that Blow Sea and Lemissoler were responsible for maintaining the forklifts and insuring that they did not contain a condition which was dangerous to any person who is operating the equipment, therefore any liability for damages caused by defective equipment rests with Blow Sea Shipping, Ltd.

Accordingly, the plaintiff's motion for summary judgment on the issue of liability will be granted.

### Conclusion

The undisputed facts in this case establish that the ship's crew either created or knew of a problem with the roof of the forklift before Ms. Poole's injury. Under the time charter, it was their responsibility to repair and maintain the forklift. There was no such duty owed by time charterers. No one has alleged a duty, nor are there any facts showing the time charterers breached any duty owed to the plaintiff. Accordingly, there is no basis for any claims against the vessel's time charterers. Summary judgment by the time charterers is granted and the claims against the time charterers, Gorthon Lines AB, Rederi Transatlantic and Transatlantic Services AB will be dismissed.

The plaintiff's motion for partial summary judgment will be granted and liability, if any, will

be assessed against Blow Sea and Lemissoler.[39]

Lake Charles, Louisiana, this ___ day of September, 2012.

PATRICIA MINALDI
UNITED STATES DISTRICT JUDGE

---

[39] The court is not making any finding with regard to the forklift and whether it was defective or inherently dangerous.

23